IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GINNY HENSHAW and COLLEEN REED,

       Plaintiffs,

     v.

THE HARTFORD INSURANCE,
HARTFORD CASUALTY INSURANCE
COMPANY, HARTFORD FIRE
INSURANCE COMPANY and DOES 1
through 20, inclusive,

       Defendants.

CIV-S-04-0022 DFL-KJM

MEMORANDUM OF OPINION
AND ORDER

Plaintiffs Ginny Henshaw ("Henshaw") and Colleen Reed ("Reed") bring this lawsuit against their former employer, defendants Hartford Fire Insurance Company and Hartford Casualty Insurance Company (collectively "Hartford"), alleging that they suffered adverse employment actions based on their age and gender. Plaintiffs allege that there was a pattern and practice within Hartford's Northern California regional office to push out older employees and replace them with younger employees. Hartford moves for summary judgment against both plaintiffs. For the reasons discussed below, the court GRANTS Hartford's motion.

I.

Both Henshaw and Reed were employed in Hartford's Northern California Region, working in the fields of sales and marketing. (Opp'n at 3-4.)  Kevin Harnetiaux ("Harnetiaux") was the regional vice president ("RVP") of the Northen California Region during the relevant time period.  (Telfer Second Decl. Ex. 4.) Harnetiaux oversaw about 40 employees in the sales and underwriting areas, broken down into smaller employment departments.  (Reed SUF ¶ 57.)

The Northern California Region is part of Hartford's Western Division.  (Telfer Decl. Ex. 126.)  Mark Dobrzenski ("Dobrzenski"), a Senior Vice President ("SVP"), has been the head of the Western Division since 2001.  (Telfer Decl. Ex. 126.) The Western Division is divided into four regional offices: (1) Denver; (2) Northern California; (3) Southern California; and (4) Southwest.  (Reed SUF ¶ 55.)  These regions are comprised of different offices in various locations; for example, the Northern California Region has both a Sacramento and a San Francisco office.  Because the bases for Henshaw's and Reed's claims differ significantly, the court discusses each of their claims and circumstances separately.

A.  Ginny Henshaw

Henshaw was employed as a select customer sales representative ("SCSR") in the Sacramento office of Hartford's Northern California Region.  (Defs.' SUF ¶ 1.)  Henshaw, who was 48 during the relevant time period, had worked for Hartford since

1976.  (Henshaw SUF ¶ 89.)

Henshaw's performance evaluations for the years 2000 and 2001 reveal a mixed performance record.  Her year 2000 evaluation, given to her by then-RVP Rich Ulrey ("Ulrey"), rated her commendable or excellent in almost every category.  (Henshaw Decl. Ex. 1.)  However, she also received a rating of "does not meet expectations" in the area of underwriting skills.  (Id.)  Similarly, while she received uniform ratings of commendable on her 2001 evaluation, given to her by her then-supervisor Ms. Jan Woods ("Woods"), Woods also noted that Henshaw's financial objectives were too low.  (Id. Ex. 2.)  Finally, on Henshaw's evaluation for the final quarter of 2001, Woods rated Henshaw an "unsatisfactory performer" in the categories of technical skills and sales/sales management.[1]  (Defs.' SUF ¶ 2; Loughran Decl. Ex. E.)

In March 2002, Mr. Chris Loughran ("Loughran") replaced Woods as Henshaw's direct supervisor.  (Henshaw SUF ¶ 95.)  At around the same time, Harnetiaux replaced Ulrey as the RVP of the Northern California Region.  (Id. ¶ 93.)  Loughran gave Henshaw another set of mixed reviews on her next performance evaluation. While she primarily received ratings of "commendable," Loughran also told Henshaw she needed to work on several areas of job development, including: (1) visiting the Select Customer Insurance Center before the end of 2002 to improve her

---

[1] Although this evaluation was written by Jan Woods, Henshaw's new supervisor, Chris Loughran, delivered it.  (Ruggles Decl. Ex. O at 96-97.)

relationships and get updated on center operations; (2) using a sales journal to uncover new sales opportunities; and (3) completing an average of 10-12 sales calls per week.  (Loughran Decl. Ex. F.)

Despite her mixed performance evaluations, other evidence suggests that Henshaw was performing her job adequately through at least the first part of 2002.  For instance, Henshaw was nominated by several coworkers for two office awards for good teamwork.  (Henshaw Decl. Ex. 3.)  Additionally, a nationwide Hartford SCSR Performance Monitoring Report listed Henshaw among the top third of Hartford SCSRs.  (Id. Exs. 103, 104.)  Finally, a Northern California SCSR monitoring report showed that, through May 2003, Henshaw was meeting her new and total business growth objectives.  (Id. Ex. 52.)

However, Henshaw's performance evaluations worsened throughout 2002 and 2003.  On February 28, 2003, Loughran gave Henshaw her final 2002 written performance evaluation.  (Mot. at 6.)  Although Henshaw received commendable ratings in most categories, she received an "unsatisfactory performance" rating in the customer satisfaction category.  (Defs.' SUF ¶ 5.)  Additionally, in the comments section of the evaluation, Loughran told Henshaw that she continued to need improvement in the areas listed on her last evaluation.  (Id.; Loughran Decl. Ex. G.)

Henshaw received another critical evaluation from Loughran on March 20, 2003.  (Loughran Decl. Ex. H.)  As part of this evaluation, Loughran addressed the following problems with

4

1   Henshaw's performance: (1) shortfalls in booking new business

2   with her "priority agents"; (2) setting her objectives for

3   business development within her territory too low; (3)

4   communication problems with the various agents in her region; (4)

5   failing to follow certain sales and agency practices, such as

6   making 10-12 calls per week and keeping a sales journal; and (5)

7   a lack of depth in Henshaw's producer evaluation documents.

8   (Id.)   Loughran concluded his evaluation by stating, "Ginny,

9   together the five areas addressed above are the core job

10  responsibilities of the SCSR position.   There is a need for

11  immediate improvement in all areas."   (Id.)

12      On April 7, 2003, Loughran issued Henshaw a sixty-day

13  Written Warning Performance Improvement Plan (an "action plan")

14  for her alleged failure to improve her job performance in the

15  five areas identified by the March 20, 2003 evaluation.   (Defs.'

16  SUF ¶ 7; Loughran Decl. Ex. I.)   Loughran asserts that it was his

17  decision to put Henshaw on an action plan, and that he asked

18  Harnetiaux only for assistance and guidance as to the proper

19  procedure for doing so.   (Ruggles Supplemental Decl. Ex. DD at

20  140-41.)   Following the issuance of the action plan, Henshaw's

21  relationship with Loughran continued to deteriorate.   Henshaw

22  began avoiding contact with Loughran and stopped responding to

23  his messages.   (Henshaw Decl. Ex. 7.)

24      Two months later, on May 27, 2003, Loughran informed Henshaw

25  that she had not met the terms of the April 7, 2003 action plan

26  and issued her a final, sixty-day written warning.   (Defs.' SUF ¶

5

9.)  As part of the final written warning, and in keeping with
Hartford's personnel policies, Henshaw was presented with a
"special separation package."  (Id. ¶ 10.)  The separation
package offered Henshaw a severance package in exchange for her
resignation and release of all claims against Hartford.  (Id.)

   Henshaw rejected the offered separation package.  (Defs.'
SUF ¶ 15.)  She was fired at the end of the sixty-day final
warning period.  (Id.)  Loughran states that it was his decision
to terminate Henshaw, although Mel Johnson ("Johnson"), a human
resources employee, was the one who called and informed Henshaw
of her termination. (Defs.' Resp. to Henshaw SUF ¶ 98.)
Henshaw's sales territory was eventually reassigned to Jan Woods.
(Id.)  Woods was 52 at the time.  (Id. ¶ 16.)

   While this conflict between Henshaw and Loughran was
escalating, Henshaw made two complaints to Victor Perez, the
assistant vice president for human resources at Hartford.
(Henshaw SUF ¶ 126.)  On April 8, 2003, Henshaw complained that
she was harassed on November 17, 2002 by an agent who teased her
about ordering rice and beans during a business dinner.  (Defs.'
SUF ¶ 34.)  Henshaw submitted a second complaint to Perez on
April 30, 2003, regarding Loughran's decision to put her on an
action plan.  (Henshaw Decl. Ex. 7.)  In the letter to Perez,
Henshaw asserted that the actions taken against her were part of
a larger pattern of age and gender discrimination in the Northern
California Region.  (Id.)  Perez looked into the allegations
raised by Henshaw's April 30,2003 complaint.  (Ruggles Decl. Ex.

R.)  On June 2, 2003, Perez issued a memo concluding that

Henshaw's claims were unsubstantiated.  (Id.)

B.  Colleen Reed

Reed was employed by Hartford as a marketing specialist in

the Sacramento office in the Northern California Region.  (Defs.'

SUF ¶ 40.)  Reed, who was 53 during the relevant time period, had

worked for Hartford since 1983.  (Reed SUF ¶¶ 52, 60.)  She

consistently received positive evaluations, honors, and other

recognition for her work.  (Id. ¶ 54.)  On October 10, 2002, Reed

was notified that her position was being eliminated on a

company-wide basis.  (Defs.' SUF ¶ 41.)  Hartford informed Reed

that if she was unable to find an alternate open position within

the company within sixty days, her employment would end effective

December 9, 2002. (Id. ¶ 42.)

During this sixty-day period, Reed attempted to find an open

position within Hartford.  (Reed Decl. ¶ 7.)  Reed filled out a

Job Interest Questionnaire with Hartford's human resources

department, asking to be considered for any vacant positions

within the Sacramento office.  (Id. Ex. 7.)  Additionally, she

expressed interest in an SCSR position that she heard might

become available in Hartford's Las Vegas office.  (Id.)  Several

of her superiors, including Harnetiaux, offered to help her in

any way they could.  (Id. ¶ 9.)

Despite her efforts, Reed was unable to find an open

position in the Sacramento office within the sixty-day period and

the Las Vegas position had not yet been posted.  There was an

opening for an SCSR position in the Northern California Region
posted during this period, but the position was based in the San
Francisco Bay area.  (Id. Ex.8; Telfer Decl. Ex. T at 146.)
Loughran and Harnetiaux hired Tamara Zars (age 26) to fill that
position. (Telfer Decl. Ex. H at 87.)  Reed did not apply for,
nor was she considered for, this position. (Defs.' Resp. to Reed
SUF ¶ 62.)  Therefore, when the sixty-day period expired, she had
not formally applied for any position at Hartford.  (Mot. at 8.)
Accordingly, her employment terminated on December 9, 2002.
(Defs.' SUF ¶ 43.)  Reed left Hartford and began working for
another insurance company soon thereafter.  (Id. ¶ 45.)

     Although she had already begun working for another company,
Reed continued to pursue the potential SCSR opening in Hartford's
Las Vegas office. (Henshaw Decl. ¶ 11.)  She formally applied
for the position on January 14, 2003 when the position was
officially posted on-line. (Defs.' SUF ¶ 45.)  The Las Vegas
office is part of the Denver Region within Hartford's Western
Division.  (Id. ¶ 46.)  Rex Sprunger ("Sprunger") was the RVP of
the Denver Region in 2003.  (Id.)

     Reed was neither interviewed nor selected for the Las Vegas
position. (Reed SUF ¶ 63.)  Another applicant, Michael Sharr
("Sharr") (age 32), was hired in March 2003. (Defs.' SUF ¶ 47.)
Darren Lewis ("Lewis"), the SCSR manager for the Denver Region,
Mel Johnson, a human resources employee who works with both the
Northern California and Denver Regions, and Sprunger all
participated in the hiring decision. (Reed SUF ¶ 63.)  However,

8

according to Sprunger and Lewis, Lewis was the principal
decisionmaker since he was the manager of the SCSRs in the Denver
Region.  (Defs.' Resp. to Reed SUF ¶ 55.)

C. Other Alleged Discrimination in the Northern California Office

Plaintiffs assert that their experiences were part of a
pattern and practice of age and gender discrimination in the
Northern California Region.  They contend there was a concealed
effort to push out the older females in the Northern California
Region and replace them with younger employees.  Below is a
summary of plaintiffs' "pattern and practice" theory.

At the center of the scheme is Dobrzenski (age 48), the SVP
of Hartford's Western Division.  (Henshaw SUF ¶¶ 92-96.)  Upon
becoming SVP in 2001, Dobrzenski "put in place" several
individuals he had worked with earlier in his career at Hartford.
First, he participated in the decision to terminate Ulrey (male,
age 54), the RVP of the Northern California region, and replace
him with Harnetiaux (age 40) in March 2002.  (Id. ¶ 93.)  Ulrey
was given an action plan and decided to accept a severance
package and leave the company.  (Id.)

Around the same time, while Ulrey was on an action plan
himself but had not yet been replaced, Woods (female, age 51),
the former select customer sales manager in the Northern
California Region, was given an action plan by Ulrey and
eventually agreed to take a demotion to an SCSR position.  (Id. ¶
95.)  She was replaced by Loughran (male, age 37).  (Id.)
Similarly, Carolyn Unger ("Unger") (female, age 54), the former

9

middle market manager, was given an action plan by Ulrey and
agreed to accept a demotion to an underwriter position.  (Id. ¶¶
112, 114.)   She was replaced by Melinda Thompson ("Thompson")
(female, age 26).  (Id.)  Dobrzenski had worked with both
Harnetiaux and Loughran at earlier periods in his career, and he
participated in the decision to hire Loughran and Harnetiaux and
to terminate Ulrey.  (Id. ¶¶ 93, 95.)  However, there is no
evidence showing that Dobrzenski participated in the decision to
give action plans to either Unger or Woods.[2]

Plaintiffs argue that, beginning with Harnetiaux's
appointment to the RVP position, a pattern emerged in which older
employees in the Northern California Region were given unexpected
action plans, forced to accept a demotion or resign, and replaced
by younger individuals.  (Opp'n at 6-8.)  Plaintiffs identify six
examples of this pattern between the years 2002 and 2003
(including Henshaw).  (Id.; Reed SUF ¶¶ 71-83.)  Additionally,
plaintiffs point to a seventh employee, Lynda Rawlings (female,
age 53) who, while not given an action plan, has allegedly been
denied any bonuses since Harnetiaux became RVP in 2002.  (Opp'n
at 6-8.)

Harnetiaux was the direct supervisor for only one of these
identified individuals.  However, as RVP, Harnetiaux admits to
being at least somewhat involved in the decision to place all of
them on action plans.  (Telfer Decl. Ex. E. at 138.)  There is no

_____

[2]  At the hearing on this matter, plaintiffs argued that
Dobrzenski was controlling Ulrey and forcing him to demote Woods
and Unger.  However, there is no evidence to support this theory.

evidence showing that Dobrzenski was involved in the decision to issue any of these action plans.  Thus, in all, plaintiffs allege that, within a two-year period, out of an office of about 40, seven employees over the age of forty (and ten counting Ulrey, Unger, and Woods, who were given action plans just prior to Harnetiaux arriving), experienced some form of adverse employment action.

While these older individuals were being "forced out," seven individuals under the age of forty were hired to fill new or otherwise vacant positions within the Northern California Region. (Henshaw SUF ¶¶ 116, 117.)  As a result of these actions, plaintiffs assert that, by the end of 2003, most of the female employees over the age of forty in the Northern California Region underwriting/sales office were forced out and replaced with employees under the age of forty.  (Id. ¶ 122.)

Loughran, who was the one who gave Henshaw her action plan, was not the direct supervisor of any of these other identified employees.  (Mot at 12.)  Besides Henshaw, Loughran has only terminated one other SCSR, Dawnya Katz, a thirty-year old employee.  (Defs.' SUF ¶ 24.)  Loughran currently supervises seven SCSRs, six of whom are female.  (Id. ¶ 25.)  He hired five SCSRs between 2001 and 2005, only one of whom is male.  (Id. ¶ 26.)  None of these new hires are over the age of forty.  (Pls.' Opp'n to Defs.' SUF ¶ 26.)

D.  Procedural History

Henshaw and Reed bring this state-law discrimination suit,

asserting claims for (1) age discrimination in violation of the California Fair Employment and Housing Act ("FEHA"); (2) gender discrimination in violation of FEHA; (3) wrongful termination in violation of public policy; and (4) breach of the implied covenant of good faith and fair dealing.  Henshaw also brings a claim for retaliation in violation of FEHA.  Hartford removed the case to federal court and now moves for summary judgment on all claims.

                                    II.

A.  Henshaw's Claims

    1.  Age Discrimination FEHA Claim

        Henshaw has not presented any direct evidence of age discrimination.  Accordingly, to prevail, she must satisfy the McDonnell-Douglas three-step burden shifting scheme for discrimination claims based on disparate treatment.  Guz v. Bechtel Nat., Inc., 24 Cal.4th 317, 354, 100 Cal.Rptr.2d 352 (2000).  Under this burden-shifting scheme,

> [a] plaintiff must first establish a *prima facie* case of
> discrimination. If the plaintiff establishes a *prima*
> *facie* case, the burden then shifts to the defendant to
> articulate a legitimate nondiscriminatory reason for its
> employment decision. Then, in order to prevail, the
> plaintiff must demonstrate that the employer's alleged
> reason for the adverse employment decision is a pretext
> for another motive which is discriminatory.

Nidds v. Schindler Elevator Corp., 113 F.3d 912, 916 (9th Cir. 1996) (emphasis in original) (quoting Wallis v. J.R. Simplot Co.,

26 F.3d 885, 889 (9th Cir. 1994)).[3]   Although Henshaw has
established a prima facie case of discrimination, she is unable
to overcome the legitimate, nondiscriminatory reason Hartford has
put forward.

a.  Prima Facie Case

To show a prima facie case of age discrimination, a
plaintiff must offer "circumstantial evidence such that a
reasonable inference of age discrimination arises." Hersant v.
Dep't of Soc. Servs., 57 Cal.App.4th 997, 1002, 67 Cal.Rptr.2d
483 (1997). "The requirement is not an onerous one." Id. at
1002-03. A plaintiff must show that "(1) [s]he was a member of a
protected class, (2) [s]he was qualified for the position [s]he
sought or was performing competently in the position [s]he held,
(3) [s]he suffered an adverse employment action . . ., and (4)
some other circumstance suggests discriminatory motive." Guz, 24
Cal.4th at 355.

Hartford contends that Henshaw fails to establish a prima
facie case of discriminatory discharge for two reasons, neither
of which are persuasive. First, it asserts that Henshaw cannot
meet the second part of the prima facie test because she was not
performing her job satisfactorily at the time of her discharge,
as demonstrated by her numerous sub-standard reviews. (Mot. at
9.) However, Henshaw has submitted objective documentation

---

[3]   "Because California law under the FEHA mirrors federal
law under Title VII, federal cases are instructive." Godwin v.
Hunt Wesson, Inc., 150 F.3d 1217, 1219 (9th Cir. 1998).

1   suggesting that, at least through May 2003, she was meeting her

2   new and total business objectives.  She also has shown that, in

3   2002, she received several company awards for good teamwork and

4   that she ranked in the top third of Hartford's SCSRs nationwide

5   on Hartford's SCSR Performance Monitoring Report.  This evidence

6   is sufficient to satisfy her minimal burden at the prima facie

7   stage.

8        Second, Hartford contends that Henshaw fails to establish a

9   prima facie case because she was not replaced by a younger

10  employee.  (Id.)  However, replacement by a younger employee is

11  not necessarily required to establish a prima facie case of

12  discriminatory firing; rather, it is only one way of suggesting a

13  discriminatory motive.  Begnal v. Canfield & Assocs., Inc., 78

14  Cal.App.4th 66, 74-77, 92 Cal.Rptr.2d 611 (2000); Heard v.

15  Lockheed Missiles & Space Co., Inc., 44 Cal.App.4th 1735, 1755,

16  52 Cal.Rptr.2d 620 (1996).  For instance, "if the replacement is

17  a transferred existing employee instead of a new hire, and there

18  is evidence that all or most new hires are substantially younger,

19  the jury could conclude the employer nevertheless reduced the

20  overall age of its workforce by terminating some employees based

21  upon age."  Begnal, 78 Cal.App.4th at 76.

22       This is what Henshaw asserts occurred in this case.

23  Although Henshaw's territory was taken over by an older employee,

24  Jan Woods, Woods was a transferred existing employee.

25  Furthermore, Henshaw provides evidence suggesting that several

26  other older employees were forced to either accept a demotion or

resign and that a large majority of the new hires were under the

age of 40.  The combination of this evidence is sufficient to

satisfy her prima facie showing.

> b.  Evidence of Pretext or Discriminatory Intent

Hartford has offered a nondiscriminatory reason for

Henshaw's termination.  It claims she was fired for poor job

performance.  (Mot. at 9.)  Accordingly, to avoid summary

judgment at this stage of the burden-shifting scheme, the

employee must "show that the articulated reason is pretextual

'either directly by persuading the court that a discriminatory

reason more likely motivated the employer or indirectly by

showing that the employer's proffered explanation is unworthy of

credence.'"  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054,

1062 (9th Cir. 2002); see also, Hersant, 57 Cal.App.4th at 1004-

05 ("[T]o avoid summary judgment, an employee claiming

discrimination must offer substantial evidence that the

employer's stated nondiscriminatory reason was untrue or

pretextual or evidence the employer acted with a discriminatory

animus, or a combination of the two, such that a reasonable trier

of fact could conclude the employer engaged in intentional

discrimination.").  If the employee is relying solely upon

indirect or circumstantial evidence of pretext, then the evidence

must be "specific" and "substantial" to survive summary judgment.

Villiarimo, 281 F.3d at 1062 (citing Godwin v. Hunt Wesson, Inc.,

150 F.3d 1217, 1221 (9th Cir. 1998)).

Henshaw attacks Hartford's articulated, nondiscriminatory

reason on several grounds, none of which are sufficient to avoid summary judgment.  First, Henshaw challenges the veracity of the poor evaluations she received from Loughran.  (Opp'n at 5.)  Good employees, she asserts, do not suddenly become bad employees after 21 years.  (<u>Id.</u>)  However, Henshaw had been receiving mixed evaluations from her previous supervisors, including Woods and Ulrey, who were both in their fifties, before Loughran and Harnetiaux arrived.  This undercuts her claim that she was framed by Loughran and Harnetiaux.

Furthermore, Henshaw's complaints about Loughran's critiques sound more like explanations for her performance than assertions that the stated reasons are false.  For instance, Loughran complained that Henshaw had serious shortfalls in obtaining new business from her top priority agents.  (Loughran Decl. Ex. I.) Henshaw does not dispute this fact, but rather argues that Loughran's expectations for her were unrealistic.  (Henshaw Decl. Ex. 7.)  She goes on to blame her performance on the failure of upper management to give her the support she needed to succeed. (<u>Id.</u>)  Likewise, in response to Loughran's criticism of her handling of agency negotiations with one of her largest agents, CPAX, Henshaw recognizes the problems with CPAX but blames them on the failure of Hartford's upper management to make certain decisions.  (<u>Id.</u>)  Finally, she admits to not responding to certain communications from Loughran, but states that she was unable to do so because of the stress that Loughran caused her. (<u>Id.</u>)

1    Henshaw does dispute the veracity of a few of Loughran's

2  criticisms.  For instance, she denies Loughran's assertion that

3  she had not been keeping pace with her sales journals.  (Id.)

4  She also claims she had a sales plan in place.  (Id.)  Finally,

5  she disputes that her producer control plans for certain agents

6  were insufficiently comprehensive.  (Id.)  However, these

7  disputed issues are only a relatively small portion of Loughran's

8  list of critiques.  Furthermore, Henshaw has not produced

9  objective documentation, besides her own statements, supporting

10 her assertions.  An employee's subjective personal judgments of

11 her own competence do not raise a genuine issue of material fact.

12 Bradley v. Harcourt, Brace and Co., 104 F.3d 267, 270 (9th Cir.

13 1996).

14    The 2002 and 2003 SCSR performance monitoring reports

15 Henshaw identifies also do not sufficiently contradict the

16 veracity of Hartford's nondiscriminatory reason.  Hartford

17 contends that Henshaw's numbers on these reports are skewed and

18 inflated because Henshaw had not been diversifying her business

19 as she had been asked to do.  (Reply at 5-6.)  Henshaw had been

20 specifically criticized for this on several of her poor

21 performance evaluations.  (Id.)  More importantly, these numbers

22 do not address directly many of the specific criticisms Loughran

23 articulated on her performance evaluations.

24    In short, Henshaw's evidence does not sufficiently call into

25 question Hartford's articulated, nondiscriminatory reason for

26 firing her.  "It is not enough for the employee simply to raise

17

1  triable issues of fact concerning whether the employer's reasons

2  for taking the adverse action were sound." <u>Hersant</u>, 57

3  Cal.App.4th at 1005.  Rather, "the employee must demonstrate such

4  weaknesses, implausibilities, inconsistencies, incoherencies, or

5  contradictions in the employer's proffered legitimate reasons for

6  its action that a reasonable factfinder could rationally find

7  them unworthy of credence, and hence infer that the employer did

8  not act for the asserted non-discriminatory reasons."  <u>Id.</u>

9  (internal quotations omitted). Henshaw's evidence fails to

10 accomplish this.

11      Second, Henshaw argues that Loughran's criticisms were

12 pretextual because Henshaw was outperforming younger co-workers

13 who were not given action plans.  (Opp'n at 5.)  Specifically,

14 Henshaw states that she was ranked higher than three SCSRs in her

15 office - - Kathleen Temple, Woods, and Tamara Zars ("Zars") - -

16 on Hartford's nationwide 2002 Select Customer Performance

17 Monitoring Report and the Northern California SCSR Monitoring

18 Report.  (Henshaw SUF ¶ 106.)  However, neither Temple, Woods, or

19 Zars were placed on action plans.  (Opp'n at 5.)

20      This argument is also unpersuasive.  As described above,

21 Hartford has questioned the relevance of these monitoring

22 reports.  Moreover, Zars is a poor comparison because she did not

23 have a sales territory at the time of the rankings.  (Opp'n at

24 5-6.)  Most importantly, even if Henshaw was outperforming these

25 other three SCSRs, this does not suggest that Loughran's true

26 motivation was age discrimination.  In fact, it suggests just the

opposite, given that Woods (age 51) is over forty as well.[4]  (Id.
¶ 51.)

Third, Henshaw rests her case heavily upon the alleged
pattern and practice of age discrimination within the
sales/underwriting section of the Northern California Region.
However, this theory is problematic for several reasons.  For
one, she has provided no statistical evidence to support it.  For
instance, she provides no documentation showing, at the end of
2003, whether the average age of the employees of the Northern
California Region had lowered or how many individuals over forty
remained.  She also provides no documentation showing whether
this pattern is statistically significant, whether it differs
from numbers from earlier years, how many other individuals under
the age of forty received action plans, or what the turnover rate
is for these positions.  Without such statistics, the court finds
it difficult to gauge the significance of plaintiffs' evidence.[5]

---

[4]  Plaintiff also argues that one can draw an inference of
age discrimination based upon the "severance package" she was
offered as part of her action plan.  See Cassino v. Reichhold
Chemicals, Inc., 817 F.2d 1338, 1342 (9th Cir. 1987) (holding
that contemporaneous offer of severance pay package in exchange
for release of all potential claims is admissible to show
discrimination).  Here, however, the offered severance package
was made according to Hartford's stated personnel policies.  It
was not a special action taken specifically with regard to
Henshaw's case.  Therefore, the offer of a severance package does
not suggest a discriminatory motive.

[5]  At the hearing on this motion, plaintiff's counsel argued
that a ruling by the magistrate judge prevented plaintiffs from
collecting such information.  Plaintiffs had sought discovery of
other examples of this alleged "pattern and practice" throughout
Hartford's Western Division.  In response to a request for a
protective order from Hartford, the magistrate judge limited
discovery to documents pertaining to the Northern California

Additionally, none of these individuals had Loughran as a
supervisor and, accordingly, none of them received their action
plans from him.  Rather, Loughran has only fired one other SCSR
between 2001 and 2005, and that employee was under the age of 40.
Henshaw argues this is irrelevant because all the employees she
references worked under Harnetiaux and Dobrzenski, and one or
both of them were involved with the action plan decisions.[6]
(Opp'n at 12.)  However, two of the individuals - - Unger and
Woods - - received their action plans before Harnetiaux arrived
and there is no evidence showing that Dobrzenski was involved in
the decision to issue their action plans.  Thus, at most there
are eight instances (including Henshaw's case) in two years where
an employee over the age of forty was given an action plan by
Harnetiaux or Dobrzenski, forced out, and replaced with an
employee under forty.

Finally, and most importantly, the referencing of these
eight cases is insufficient to overcome Hartford's legitimate,
nondiscriminatory reason.  The Ninth Circuit has held that "[t]o

---

Region and the Las Vegas office from December 1, 2001 to the
present.  (01/06/2005 Order at 1-2.)  Plaintiffs contend that
this ruling prevented them from providing statistical evidence of
the kind described above.  However, if plaintiffs felt that they
were unable to present sufficient evidence to satisfy their
summary judgment burden, it was incumbent on them to make a
motion under Fed.R.Civ.P. 56(f) for a continuance to allow for
additional discovery on these issues.  Plaintiffs have not done
so here.

[6]   Henshaw also argues that Loughran's firing of Katz is
irrelevant because Loughran only fired her after Henshaw had
instituted this lawsuit and Katz's firing was "damage control."
(Pls.' Resp. to Defs.' SUF ¶ 24.)  However, Henshaw has presented
no evidence supporting this allegation.

establish a prima facie case based solely on statistics, let
alone raise a triable issue of fact regarding pretext, the
statistics 'must show a stark pattern of discrimination
unexplainable on grounds other than age.'" <u>Coleman v. Quaker
Oats Co.</u>, 232 F.3d 1271, 1283 (9th Cir. 2000) (quoting <u>Rose v.
Wells Fargo & Co.</u>, 902 F.2d 1417, 1423 (9th Cir. 1990)).
Statistics that do not take into account variables other than age
are unpersuasive. <u>Id.</u>

Accordingly, a plaintiff's statistical evidence must
eliminate nondiscriminatory explanations for the disparate
treatment by only looking at comparable individuals. <u>Rea v.
Martin Marietta Corp.</u>, 29 F.3d 1450, 1456 (10th Cir. 1994).
Courts have held that for statistical comparisons to be
significant, the comparisons must take into consideration whether
the other employees have the same job duties, similar performance
evaluations, and similar supervisors. <u>Id.</u>; <u>Furr v. Seagate
Tech., Inc.</u>, 82 F.3d 980, 986-87 (10th Cir. 1996).

Here, the eight identified individuals worked under at least
three different supervisors and held various different positions.
Further, two of the employees, Jan Schumacher and Bonnie Daniels,
had a history of performance problems prior to their separation,
and another identified employee, Carolyn Unger, admitted that the
issues raised in her action plan "were not fake." (Defs.' Resp.
to Reed SUF ¶¶ 75, 81, 82.) Even the type of adverse action these
employees suffered is not uniform; one of the identified
employees, for example, was denied bonuses as opposed to

receiving an action plan.  The only similarities common to all

(besides age) are that they all worked in the sales/underwriting

section of Hartford's Northern California Region under Harnetiaux

and Dobrzenski.[7]  Accordingly, Henshaw's attempted comparisons to

_____

[7]  The lack of similarity between the eight, identified
employees is evidenced by the below chart:

| Name | Position | Supervisor | Current employment status | Other differing features |
|------|----------|------------|---------------------------|--------------------------|
| Daniels, Bonnie | Senior Underwriter | Anna Martinez | Resigned | Daniels had history of prior performance issues. |
| *Henshaw, Ginny* | *SCSR* | *Chris Loughran* | *Fired* | |
| Miller, William | Middle Market Underwriter | Melinda Thompson | Resigned | |
| Rader, Diane | Business Technology Solutions Manager | Kevin Harnetiaux | Resigned | |
| Rawlings, Lynda | Middle Market Underwriter | Leah Locca (current supervisor)/ Melinda Thompson (previous supervisor) | Current employee | Never received an action plan. Rather, she has allegedly been denied bonuses |
| Schumacher, Jan | Senior Underwriter | Anna Martinez | Resigned | Had received an action plan on an earlier occasion |

1  these other employees is flawed.

2      Even if these eight other employees are sufficiently

3  comparable, the court cannot say they create a sufficiently

4  "stark pattern unexplainable on grounds other than age" without

5  further statistical evidence.  For example, a court has found

6  that a sample of eight employment decisions over a course of two

7  years was too few to be statistically meaningful.  See Turner v.

8  Texas Instruments, Inc., 555 F.2d 1251, 1257 (5th Cir. 1977),

9  overruled on other grounds by Burdine v. Tex. Dep't of Cmty.

10 Affairs, 641 F.2d 514 (5th Cir. 1981); Mundy v. Household Fin.

11 Corp., 885 F.2d 542, 546 (9th Cir. 1989) ("In a large corporation

12 with branch offices throughout the country, the discharge of

13 seven older employees over a two and half year period alone does

14 not establish a pattern or practice of discrimination.").

15     Admittedly, the sample pool that Henshaw focuses on - - an

16 office of forty - -  is significantly smaller than the entire

17 corporation.[8]  Dobrzenski was the SVP of the Western Division

18 _____

| Ulrey, Richard | Regional Vice President | Mark Dobrzenski | Resigned | |
|---|---|---|---|---|
| Unger, Carolyn | Executive Underwriter | Melinda Thompson | Resigned | Had received action plan on earlier occasion |

(Mot. at 13.)

    [8]  Dobrzenski was the SVP of the Western Division, which
includes three other regions, in addition to the Northern
California Region.  Yet plaintiff offered no statistics on hiring
and termination from the other regions during the relevant time

1  Nonetheless, in light of the lack of statistical evidence

2  supporting this pattern, the differences in job position,

3  performance history, and direct supervisors among the identified

4  individuals, and Henshaw's failure to seriously challenge

5  Hartford's stated reason for firing her, Henshaw's "pattern and

6  practice" theory is insufficient for a jury to find age

7  discrimination.  Accordingly, the court GRANTS Hartford's motion

8  for summary judgment on this claim.

9       2.  Gender Discrimination FEHA Claim

       Gender discrimination and age discrimination claims under

10

11  FEHA are governed by the same legal analysis.  Beale v. GTE Cal.,

12  999 F.Supp. 1312, 1320-21 (C.D.Cal. 1996).  Henshaw's gender

13  discrimination claim is substantially weaker than her age

14  discrimination claim.  Her proffered evidence is insufficient to

15  establish a prima facie case of gender discrimination, let alone

16  overcome Hartford's proffered nondiscriminatory reason.

       While Henshaw can satisfy the first three elements of the

17

18  prima facie case, she has offered insufficient evidence to

19  suggest a discriminatory motive based on gender.  Henshaw was

20  replaced by another female.  Moreover, the "pattern and practice"

21  she describes is not suggestive of gender discrimination.  By

22  Henshaw's own admission, several of the older employees who were

23  forced to resign or accept a demotion - - such as Diane Rader,

24  Carolyn Unger, Bill Miller, and Rich Ulrey - -  were replaced by

25

26  _____

period.

younger individuals of the same sex.  Also, several of the

individuals plaintiffs identify as part of the alleged pattern

and practice are men (Miller and Ulrey).  Finally, seven of the

eight SCSRs Loughran currently supervises are women, and four of

the five new SCSRs Loughran has hired are women.  In short,

Henshaw has presented no evidence suggesting a discriminatory

motive based on gender.  Accordingly, the court GRANTS Hartford's

motion for summary judgment on Henshaw's gender discrimination

claim.

        3.  Wrongful Termination in Violation of Public Policy Claim

        Henshaw's claim for wrongful termination in violation of

public policy is premised on her claim for age and gender

discrimination.  For the same reasons the court grants summary

judgment on Henshaw's age and gender discrimination claims, it

also GRANTS summary judgment on this claim.

        4.  Retaliation Claim under FEHA

        The McDonnell-Douglas burden-shifting test also governs

retaliation claims.  Yartzoff v. Thomas, 809 F.2d 1371, 1375 (9th

Cir. 1987).  To establish a prima facie case of retaliation,

plaintiff must show that: (1) she engaged in a protected

activity; (2) she suffered an adverse employment action; and (3)

there was a causal link between the protected activity and the

adverse employment action.  Id.  To establish causation, Henshaw

must show that "engaging in the protected activity was one of the

reasons for [her] firing and that but for such activity [she]

would not have been fired."  Villiarimo, 281 F.3d at 1064-65.

1   Henshaw alleges she was terminated in retaliation for the

2  complaint she submitted to Victor Perez in late April 2003.

3  (Henshaw Decl. Ex. 7.)  Henshaw's sole basis for alleging a

4  causal connection is the proximity in time between her filing the

5  complaint and her termination (approximately three months).

6  (Opp'n at 14.)

7   The temporal proximity present in this case is insufficient

8  to establish the causation element.  "[T]iming alone will not

9  show causation in all cases; rather, 'in order to support an

10  inference of retaliatory motive, the termination must have

11  occurred fairly soon after the employee's protected expression.'"[9]

12  Villiarimo, 281 F.3d at 1065 (quoting Paluck v. Gooding Rubber

13  Co., 221 F.3d 1003, 1009-10 (7th Cir. 2000)); Clark County School

14  Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S.Ct. 1508 (2001)

15  (stating that the temporal proximity must be "very close").

16  Courts have found a three month period between the protected

17  activity and the adverse employment action insufficiently close

18  to support a finding of causation based on proximity of time.

19  Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997);

20  Clark, 532 U.S. at 273-74 (citing Richmond with approval).

21

22      [9]   Hartford cites Chen v. County of Orange, 96 Cal.App.4th
23  926, 948, 116 Cal.Rptr.2d 786 (2002) for the proposition that
   California courts have moved away from accepting temporal
24  proximity as a sufficient basis for a prima facie claim of
   retaliation.  However, Chen does not explicitly reject the line
25  of cases allowing temporal proximity to establish a prima facie
   case of retaliation.  Furthermore, it has been distinguished by a
26  later California case.  Cal. Fair Employment Hous. Comm'n v.
   Gemini Aluminum Corp., 122 Cal.App.4th 1004, 1020-21, 18
   Cal.Rptr.3d 906 (2004).

Here, Henshaw's termination occurred three months after she submitted her complaint to Perez.  Therefore, this temporal proximity is insufficient to establish her prima facie case, let alone her burden to overcome Hartford's nondiscriminatory reason for terminating her.  Moreover, at the time she submitted her complaint, Loughran had already given her the action plan listing all of the explicit criticisms he had of her job performance. This further weakens Henshaw's temporal proximity argument. Accordingly, the court GRANTS summary judgment on Henshaw's retaliation claim.[10]

### 5.  Breach of Covenant of Good Faith and Fair Dealing

"The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive *benefits of the agreement actually made*."  Guz, 24 Cal.4th at 349 (emphasis in original).  Accordingly, the breach of the implied covenant cannot be based upon a claim that the discharge of an at-will employee was made without good cause.  Id. at 350.

---

[10]   Henshaw also makes reference to a formal complaint of harassment she filed in early April 2003 based on allegations that she was ridiculed at a business dinner for ordering beans and rice.  (Henshaw Decl. Ex. 5.)  However, Henshaw does not appear to rely upon this complaint in her opposition or declaration, focusing instead on the age and gender discrimination complaint she filed in late April 2003.  Even if she did attempt to rely on this complaint, she still fails to state a prima facie claim of retaliation.  This complaint was filed earlier than the age/gender discrimination complaint, making the temporal proximity argument even weaker.  Furthermore, her complaint about ridicule over her food choice does not implicate FEHA and, therefore, cannot be a basis for a FEHA retaliation claim.

1    Summary judgment is appropriate on this claim because

2 Henshaw was an at-will employee.  California Labor Code § 2922

3 creates a presumption that an employment that has no specified

4 end date is an at-will employment relationship.  Furthermore,

5 Hartford's personnel policies expressly provide that all

6 employment is at-will. (Defs.' SUF ¶ 38.)

7    Henshaw neither disputes these facts nor explicitly asserts

8 that there was an implied-in-fact contract.  Rather, she argues

9 that Hartford violated its own articulated policy of zero

10 tolerance of discrimination even after being notified of the

11 illegal conduct by her complaint to Perez.  (Opp'n at 14.)  This

12 is just another way of arguing that she was fired without cause

13 and for an unlawful purpose.  She has provided no evidence

14 showing that this policy created an implied-in-fact contract

15 limiting Hartford's termination rights.  Accordingly, summary

16 summery judgment is GRANTED on this claim.

17 B.  Colleen Reed

18    1.  Age Discrimination FEHA Claim

19    Unlike Henshaw, Reed does not allege that she was wrongfully

20 terminated on the basis of her age.  (Defs.' Resp. to Reed's SUF

21 ¶ 54.)  Rather, Reed argues that she was wrongfully discriminated

22 against on the basis of age during her search for a new position

23 within Hartford.  (Opp'n at 12.)  Specifically, she alleges that

24 Hartford wrongfully failed to hire her for the SCSR position in

25 Las Vegas, hiring a less-qualified 30-year old male instead.

26 (Id.)  She also asserts that Hartford wrongfully failed to inform

28

1   her of, or consider her for, other available jobs in the Northern

2   California Region, such as the new SCSR position filled by 26-

3   year old Tamara Zars.  (Id.)

4       Hartford does not dispute that Reed can establish a prima

5   facie claim of age discrimination.  (Mot. at 15.)  Rather, it

6   asserts a nondiscriminatory reason for not hiring Reed for the

7   above positions.  Hartford contends that Sharr was more qualified

8   than Reed for the Las Vegas position because: (1) he achieved

9   significant agency sales growth and market share while employed

10  with Zurich, another Las Vegas insurance company; (2) he had

11  current business relationships in the Las Vegas region; and (3)

12  he had a college degree.  (Id. at 16.)  With regard to the San

13  Francisco position filled by Zars, Hartford contends that Reed

14  did not apply for this position and explicitly stated she was

15  only interested Sacramento positions.  (Defs.' Resp. to Reed SUF

16  ¶ 62.)

17      None of Reed's proffered evidence is sufficient to overcome

18  Hartford's nondiscriminatory reasons.  First, and most centrally,

19  Reed argues that she was more qualified for the SCSR position

20  than Sharr.  (Opp'n at 12.)  She asserts she is more qualified

21  because: (1) she has over thirty-six years of experience in the

22  insurance industry; (2) she is familiar with the Las Vegas

23  agents, having lived and worked in Las Vegas in the mid-1980s and

24  late 1990s; (3) she has a deep involvement in the Las Vegas

25  insurance industry, having served as vice president and president

26  elect of Insurance Women of Las Vegas (1999-2000); and (4) she

has worked for Hartford for over 17 years, almost exclusively in the field of sales, marketing, and underwriting.  (Reed Decl. ¶ 18; Id. Ex. 12.)

Although Reed makes a plausible argument that she was, in fact, more qualified than Sharr, courts have required more than this kind of showing in order to establish pretext.  "The question is not whether the employer properly evaluated the competing applicants, but whether the employer's reason for choosing one candidate over the other was honest."  Millbrook v. IBP, Inc., 280 F.3d 1169, 1175 (7th Cir. 2002).  Accordingly, while evidence that Reed was more qualified than Sharr is relevant to an argument of pretext, "differences in qualifications between job applicants are generally not probative evidence of discrimination unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue."  Deines v. Tex. Dep't of Protective & Regulatory Servs., 164 F.3d 277, 279 (5th Cir. 1999).

Reed's qualifications are not so clearly better than Sharr's that a jury could infer a discriminatory motive.  Sharr did have certain qualifications that would make him a more impressive candidate than Reed, namely, his college degree, his current contacts with Las Vegas agents, and his impressive track record in recruiting new business in his last job.  Although a college degree was not required for the position, the job position did

state that a bachelor's degree was the "desired education level" for applicants.  (Johnson Decl. Ex. A.)  Accordingly, Reed's evidence of her qualifications is insufficient to avoid summary judgment.

Regarding the new Northern California SCSR position filled by Zars, Reed does not offer any convincing evidence to refute Hartford's proffered, nondiscriminatory reason.  She complains that she was never informed of this position, despite expressing interest in any vacant position in the Northern California Region.  (Opp'n at 3-4.)  However, the evidence shows that Reed only expressed interest in positions in the Sacramento office, and explicitly did not want a position in the San Francisco area. (Telfer Decl. Ex. T at 146; Reed Decl. Ex. 7.)  Accordingly, Reed's age discrimination claim, if valid, must rest on her denial of the Las Vegas position.

As a second basis for finding pretext, Reed asserts that another younger employee was treated more favorably than her. (Opp'n at 12.)  She alleges that, unlike her, another Hartford employee, Phaedra Starr (age 25) did not have to compete for a new position when her job was eliminated.  (Id.)  Starr's position as the business technology sales manager in the Northern California Region was eliminated in 2003, and she was hired by Loughran and Harnetiaux for a vacant SCSR position in the Sacramento office in January 2004.  (Reed SUF ¶ 68.)  Loughran testified that Starr did not have to apply for the SCSR position. (Telfer Decl. Ex. J at 267.)

It is hard to judge the significance of this comparison based on the limited facts provided by Reed.  For instance, the court does not know how many other applicants there were, what their qualifications were, or whether the job was ever posted. Even if Reed had provided more information, the comparison to Starr is of limited value because Reed and Starr were not in comparable positions.  Starr's hiring occurred over a year after the elimination of Reed's position and the decisionmakers in Starr's case (Loughran and Harnetiaux) were different than the decisionamakers for the Las Vegas position (Darren Lewis and Sprunger).

Third, Reed argues that Harnetiaux promised to help Reed obtain the Las Vegas position, but never did so.  (Opp'n at 12.) This, she claims, suggests a discriminatory motive.  (Id.)  Even if this allegation is true, Harnetiaux had no involvement in the hiring decision for the Las Vegas position.  Accordingly, this alleged fact is irrelevant.

Fourth, Reed points to Hartford's policies of "retention of talent" and hiring from within.  (Id. at 4.)  She argues that Hartford's failure to hire her, in spite of these policies, suggests a discriminatory motive.  (Id.)  However, these policies apply only when all other factors are equal.  (Telfer Decl. Ex. E at 71-72.)  As described above, Reed has not sufficiently refuted Hartford's assertion that Sharr was more qualified than she for the position.

Finally, Reed relies on the same alleged pattern and

1  practice of discriminatory acts described above.  (Id. at 12.)

2  Reed attempts to connect this alleged pattern to the Denver

3  Region by: (1) showing that Dobrzenski hired Sprunger as the RVP

4  of the Denver Region; (2) pointing to one instance where a 54-

5  year old SCSR in the Las Vegas office (Virginia Schultz) was

6  allegedly forced to accept a demotion and was replaced by an

7  individual under 40;[11] and(3) associating Mel Johnson, the human

8  resources employee, who worked with both the Denver and Northern

9  California Regions, with the decision to hire Sharr.  (Id. at 3.)

10      These arguments are unavailing.  Even if Reed and Henshaw

11  have shown a pattern and practice of discrimination in the

12  Northern California Region, Reed's evidence suggesting a similar

13  pattern in the Denver Region is nearly nonexistent.  Dobrzenski's

14  hiring of Sprunger is not suggestive of discrimination, and the

15  one case of alleged discrimination hardly amounts to a pattern or

16  practice.  Furthermore, Reed's reference to Mel Johnson's role in

17  this alleged scheme is unsubstantiated.  She presents no evidence

18  beyond mere speculation that Johnson was part of this alleged

19  discriminatory scheme.

20      For the above reasons, Reed fails to overcome Hartford's

21  nondiscriminatory reason for hiring Sharr.  The court therefore

22  GRANTS Hartford's motion for summary judgment on this claim.

23      2.  Gender Discrimination FEHA Claim

24      Reed has also provided insufficient evidence to avoid

25

26      [11]  Schultz's position was the one Reed was applying for and
that Sharr eventually filled.

summary judgment on her gender discrimination claim.   Although
Reed has established a prima facie case of gender discrimination,
she has not met her burden of proving that Hartford's
nondiscriminatory reason is false or that its true motivation was
gender discrimination.

As explained above, Reed has not presented evidence showing
she was so much more qualified than Sharr as to make Hartford's
explanation implausible.   Furthermore, as described earlier, the
alleged pattern and practice of discrimination does not support
an inference of gender discrimination.   In fact, two of the
younger individuals that Reed complains received better treatment
than her as part of her age discrimination claim - - Phaedra
Starr and Tamara Zars - - are both women.   Accordingly, the court
GRANTS Hartford's motion for summary judgment on this claim.

### 3.  Wrongful Termination in Violation of Public Policy

Reed's claim for wrongful termination in violation of public
policy is premised on her claim for age and gender
discrimination.   Accordingly, the court GRANTS summary judgment
in favor of Hartford on this claim for the same reasons it grants
Hartford's summary judgment motion on Reed's age and gender
discrimination claims.

### 4.  Breach of the Covenant of Good Faith and Fair Dealing

Although both Henshaw and Reed assert a claim for breach of
the covenant of good faith and fair dealing, the allegations
included in plaintiffs' complaint appear more relevant to Henshaw
than Reed.   For instance, plaintiffs allege that defendants

breached the covenant by "failing to investigate their claims of unfair treatment, to eradicate discrimination and by retaliating against plaintiffs, ultimately resulting in their termination." (Compl. ¶ 41.)   However, Reed never complained about any alleged violation and does not dispute that her position was eliminated on a company-wide basis.   Therefore, it is unclear what the basis for Reed's claim is.   In any event, Reed's claim fails because she, like Henshaw, was an at-will employee.[12]   Accordingly, the court GRANTS summary judgment in favor of Hartford on this claim.

///

///

///

///

///

///

///

///

///

---

[12]   To the extent Reed is arguing that Hartford breached the implied covenant by not taking sufficient steps to insure she found a new position within Hartford, this argument is not supported by the record.   The letter Reed received informing her of the elimination of her position merely stated that Reed was eligible to use Hartford's job transition center.   (Ruggles Decl. Ex. U.)   It did not promise her that she would be rehired in a different position or make her any specific promises about her future.   Similarly, any argument that Hartford breached its policy of "retention of employee talent" and favoring hiring from within the company are without merit.   These policies only apply when all other factors are equal, and Reed has not shown that she was more qualified than Sharr.

                              III.

       For the above reasons, the court GRANTS Hartford's motion
for summary judgment in its entirety.  The clerk shall enter
judgment.


        IT IS SO ORDERED.

Dated: 6/30/2005


                              _____
                              DAVID F. LEVI
                              United States District Judge